Good morning, Your Honor. I'm Robert Bruno, and I represent David Kong, the appellant in this case, and may it please the Court. On its face, Section 4454 of the Balanced Budget Act of 1997 has at least two undeniable characteristics that are fatal under Establishment Clause analysis. Number one, it discriminates among religious organizations in the definition of who's eligible. Number two, it provides direct funding to religious organizations without assurance that it's going for secular activities in a non-neutral manner and designated beneficiaries with respect to their religion. The reason that we have so many Establishment Clause issues raised in this case is because never before in the history of our country, and maybe you could go back to colonial times to find some examples of this, but we have never had a government designating a religious organization as the sole provider of a government benefit to a set of people who have a particular religious belief. That's unprecedented in the history of our country, and that's exactly what Section 4454 does. It provides special benefits under a special regime of Medicare, and it designates a specific religious organization to administer those benefits, and it pays that religious organization. Let me ask you, if I may, something that is not really so much troubling about this case as it is it's unique to this case, and that is where you happen to have a particular religious sect that has a unique belief, one that doesn't happen to be shared across religious lines, wouldn't you inevitably, in order to accommodate those religious beliefs, have to, if not single out, at least make provision for that sect? Well, that was an issue that was troubling to Judge Breyer. The United States Supreme Court has never addressed that. The closest it's come is the State of Thornton v. Keldor, where it said that you can't just give a benefit to Sabbatarians. The Supreme Court has never upheld an accommodation that applies just to one sect. And I think when you talk about unique sects, I think every sect is unique. Everybody has got beliefs that aren't shared by somebody else. I mean, if we're going to go down the road of accommodating specific unique beliefs, then you've got to adopt specific unique programs for everybody who's got unique beliefs. That, to me, doesn't seem a test that's practicable. Well, it's not so much a test. It's a consequence of accommodation. And do you see any difference here, for example, because the nature of the benefits for which we all pay into the system are really kind of a broad public benefit, which would distinguish this case from other circumstances that you might allude to? Well, there's a lot of broad public benefits that the government can get involved in. I mean, the fact that the government funds certain public activities, such as sports stadiums or museums, does that mean that we can accommodate those whose religious beliefs doesn't allow them to attend the museum or attend the sports facility by simply funding the religious organization that they belong to and then say, well, it's really just a little bit of money, and the taxpayer, if they had to pay for those people who went to the sports stadium, it's really just a little bit less than what we would be funding at the sports stadium. I mean, the Supreme Court has never gone down that road. Speaking of the Supreme Court, are you familiar with any Supreme Court case that has held unconstitutional as an establishment of religion a federal program giving federal money to federal personnel? A federal program giving federal money to federal personnel? To perform services. To perform services. I'm not familiar with what you're talking about. Well, I'm asking you, is there such a case? I'm not aware of any such case. I'm not aware of any such case. That's the difficulty of your position. You found a few cases involving schools, state schools, that sort of thing, but if you look at the jurisprudence of the Supreme Court, it's really hard to find that they ever thought the federal government itself established a religion by affording a federal benefit. Well, whether the government action is federal government action or state government action, I don't think is material to the analysis. I'll tell you, one has to be a bit of a realist in these things to see what the Supreme Court does, not so much what it says. It never has found one. Right, and it's never upheld one. It's never upheld a special accommodation under federal law either. So what do you think of the draft law, beginning with the draft law in World War I, where the historic peace churches were singled out for exemption? Well, I don't think the peace churches weren't singled out. Individuals were singled out. Well, the law statute speaks of the historic peace churches. If you're a member of that, you get a conscientious objection. The subject matter of that law was individuals, and that's what distinguishes. Well, why was it individuals? They started with the membership in the church. If you were a member of that church, you got into a special federal program, which kept you out of fighting at the front. Because Larson v. Valenti in footnote 23 says that when a statute focuses precisely and directly on religious organizations, you apply a different test than you would in Gillette, where the statute focuses only on individual conscientious belief. I'm not sure what cases you're referring to about membership in a peace church, but I think the statutory scheme dealt with individuals. It required individuals to do something, and this statute requires organizations to be the sole beneficiary. What I'm referring to, as of the selective draft cases of 1917, is the first draft law where there is that exemption. But if you go on to Gillette and Negri, there you have an exemption in favor of believers in total pacifism and a draft of people who believe in just war theory. There's a clear religious distinction based on your religious belief. In Negri, they draft the Catholic who believes there's an unjust war. Gillette, they don't draft the total pacifist. Larson v. Valenti creates a new standard from those cases that deal with individual belief and those cases which focus on organizations in their regulation. It says so explicitly in footnote 23, and I've quoted it in the brief. That's our strongest authority, a footnote in a what year is that case? I believe it's 79 in that era. I take your point, though. I mean, there is a difference in the analysis that the Court has done between individuals and organizations. But now that we're on the topic of the draft, let me ask you a related question. In some of the draft cases, it suggested that the statutes could be saved by, rather than being declared unconstitutional, by rewriting them in effect to avoid the religious focus, if you will, in the Kearest-Joel case as well as an earlier draft case. Do you think that would be possible here in the context of this statute, for example, to save the statute from unconstitutionality by the Court invoking a nonreligious view, which is something I think even suggested in the government's red brief? No, there's a couple of ways you could do it. You could give the individual conscientious objector essentially a voucher to let him go anywhere he wanted to, or you could throw out the definition of the religious organizations, which discriminate and in effect designate a single religious organization or type of religious organization. And you'd have to throw out the direct funding part of it, too, because in addition to there being discrimination here on the basis of sect, you've also got a clear violation of the Agostini principles or the prohibition against direct funding principles that the Court has laid down over the years. Do you think it would be constitutional if the law were phrased like the Amish, in other words, that Christian scientists didn't have to pay into the system? That might be possible. There's an indication of that. However, in the United States v. Lee, the Court specifically withheld consideration of the Establishment Clause challenge to that particular accommodation. It called it an accommodation but said we're not going to decide the Establishment Clause issue here in the United States v. Lee. So I think that's an open question of how the Supreme Court would deal with an exemption from taxation. Possibly they could do it, but we don't know for sure. But we know that the test for direct funding is that no tax, large or small, can be used to finance any religious activity or institution, no matter what it's called. That's directly out of Everson. What about the Rosenberger case where the state collects fees and pays them to wind awake a religious organization? Right. Rosenberger went through a litany of all the Establishment Clause issues and then decided the case on a limited public forum basis where it said, as long as we're funding all the speech of all these organizations, we're only paying their printing costs, it would be unconstitutional to exclude the religious group from paying their printing costs. Well, it's a penny paid. It's money taken by the state and used to subsidize religious activity, isn't it? Well, it is. But as you know, the public forum cases require no discrimination on the basis of content. The Gintala decision is a good example of that from this circuit. The court decided. And Widmar against Vinson? Widmar against, right. Facilities given for religious services? That happened to be a statute that was involved there, but it's the same principle. When there is a limited public forum created by government, you have a different rule, obviously. You can't discriminate on the basis of content. That's a big dent in your principle of no subsidy. Well, the Supreme Court over the years has dealt with different categories of statutes in different ways. And when there are First Amendment speech considerations, it has given different treatment. This case doesn't implicate that at all. This is a direct payment of funds to religious organizations. How about subsidizing religious buildings, buildings of worship, as in Walsh and other cases, sustaining the exemption from taxation of religious buildings? Walsh was not an accommodation case. Walsh exempted a broad range of nonprofit organizations. And the court relied on the breadth of that statutory scheme to say that churches could be one of those organizations and without offending the Constitution, giving them a tax exemption. Even though they were places of worship, right? That's right. So you're saying that there's no case that would permit a federal government benefit directly paid to a religious institution where the benefit was paid for a nonreligious purpose? Only if it's included in a broad range of other things and the aid is distributed in a neutral manner. I have to stop on that to try to understand what you just said. Maybe you could explain that a little further. Well, the court has said in cases of indirect aid, religious organizations, namely parochial schools, can be the recipient of certain types of things, such as textbook loans, textbook grants, reimbursement of testing expenses, things that can't be diverted to a religious purpose. The court said that religious schools can be within that scheme, provided there's a number of factors that you meet. One of them is that the program must be neutral with respect to religion. This is Agostini, Mitchell v. Helms, and Zellman. Over the last three terms, we've had this rule announced three times, that when you're dealing with these neutral things that can't be diverted to a religious use, you have to meet a number of factors. They must be neutral with respect to religion. You can't identify the beneficiaries by reference to their religion, and you can't directly fund religious activity. And clearly this statute doesn't meet those tests. This is clearly not neutral with respect to religion. This is clearly a statute where religion identifies who the beneficiaries are, both as to the religious institutions that can provide the benefits and the religious believers who can attend them. How can you accommodate? I mean, it does seem like, apart from the fact that our Establishment Clause cases are not clear, most people would agree that it's hard to follow all the threads in the various establishment cases, but how would you ever accommodate the Christian scientists if you didn't acknowledge what their particular belief is that might need or necessitate accommodation? I think the Supreme Court hasn't told us that yet. There hasn't been an accommodation case that applies only to one religion. There's really only been two accommodation cases that have survived the Establishment Clause challenge, and that's Amos and Zorot v. Clausen. And both of those are direct burden cases where government is going to come in and regulate the religious organization or the religious activity unless there's an exemption given. And the Court upheld an accommodation of those direct burdens. There has never been an accommodation of an indirect burden. The only thing that comes close to that is the Sherbert line of cases for unemployment compensation. And as you pointed out recently, Judge McKeown, in Davey v. Locke, the Supreme Court has confined that Sherbert theory of indirect burden solely to unemployment compensation. Unfortunately, I was in the dissent. You were in the dissent, but I think you were right. Even though I was right. Let me test your principles a little bit on the military chaplaincies. You know, a very large amount of federal money goes to pay for Jewish and Protestant and Catholic chaplains, direct subsidy of their religious activities. Do you believe that's all unconstitutional? Well, the Supreme Court has held that it is constitutional because you've got a free exercise problem. When you put people in the military, you take them away from their religious backgrounds, and you have to provide them with the opportunity to practice. How do you pay to accommodate by actually supporting these acts of worship? Only when you've taken somebody away. And the same way with the prison cases, when you've got the prison chaplains. You've taken people out of their environment. You have to provide them with an opportunity to practice their religion under the free exercise clause. How about paying the chaplains of Congress? Well, I think that's a good issue. Marx v. Chambers is the... I've decided that for a legislator, do you think the court would be different with Congress? That's hard to say. It's hard to say. Marx v. Chambers says that when it's an activity that has existed for so long in our nation's history that it's become part of the fabric of government, that it will survive an establishment clause challenge. It's fairly hard to get a distinct principle with all these exceptions. I think the court's been looking for this grand unified principle of the establishment clause, but certainly it has created these categories, and there are two categories where the law is clear here, and that's the Agostini-Mitchell-Zellman line for indirect aid or Everson when it's a direct aid, and the anti-discrimination principle of Larson v. Valenti. Counsel, let me ask you this. In your view, where did the court go wrong in the Eighth Circuit Child 2 decision? Where did the analysis go wrong? The analysis went wrong when it refused to apply Larson, and then when it invented a new test in order to avoid the application of Agostini. And what was the new test that you proposed that was invented in that case? What they did is they took a sentence out of the Texas Monthly Three-Judge Plurality Opinion saying that direct subsidies to religion which burden others significantly or which do not remove a significant government-imposed burden must be and could not be seen as other than an endorsement of religion. They took that sentence. They took the negative of it, and they said, well, as long as we don't burden religion, as long as we're removing a burden, they simply took the negative of it and said if it meets those two tests, then it's constitutional. The U.S. Supreme Court has never adopted that as the test. So you're not disputing that they were using the plurality decision? You think they just inverted it incorrectly? Both. It's a test that's never been adopted by the Supreme Court. It's a sentence that appears only in the three-judge plurality in Texas Monthly. If that were the test, Your Honor, what was the court doing in Agostini, Mitchell, and Zellman writing volumes of concurrences and dissents if that's the test for funding? It's absurd. The court has not backed away from Agostini, Mitchell, and Zellman as the rules for indirect aid, and they certainly haven't backed away from the prohibitions on direct aid when there aren't these other considerations involved. You said something before in response to one of Judge Noonan's questions that made me stop, and I thought you were equating free exercise and accommodation, or did I mishear what you were saying? No, he was asking about soldiers on the battlefield, whether they should have chaplains or whether it's constitutional to provide chaplains for those people. No, I — You agree that there's not a parallel analysis necessarily between the free exercise — Yes. — and the accommodation, correct? That's right. Okay. Okay. We'll give you some time for rebuttal, and we'll add it on to the other side. Thanks. Good morning, Your Honors. My name is Lowell Sturgill. I'm here from the Department of Justice representing the government. I'd like to begin, if I may, by trying to address some of the questions the court has asked. I'd like to first begin, Judge McHugh, in your question about the nature of accommodating a single religious belief. And I think the Kyrgios-Joel opinion from the Supreme Court gives you the roadmap that answers that. And I think Kyrgios-Joel says it is permissible for the government to accommodate what it understands to be the unique belief of a group, as long as it does so in religiously neutral terms. And that's what Section 4454 does here. It accommodates the Christian scientists and any other group or any other person who has a religious objection to medical care. You know, one of the problems, of course, is whether this is a fig leaf or a gerrymander. In other words, you have the legislation that's declared unconstitutional, and then you just kind of take out one word and put in another. And so facially, you know, it looks okay, but is it basically a fig leaf, and it puts you right back in the same place? Well, I think the first place to start in answering that is with the general notion that courts are supposed to grant Congress the benefit of the doubt and not attribute to Congress unconstitutional motives. Especially here, what Congress has done is on its face religiously neutral. Again, Section 454 is a benefit to any individual who has a sincerely held religious belief that forbids them from getting medical care. Now, in fact, we don't know exactly what kinds of religious groups or religious individual beliefs might fit within that exception, that there could be numerous groups that believe the same way. In fact, given the nature of religious belief, it's not hard to believe that there could be numerous individuals who for their own particular religious reasons hold that very same belief. So I think, again, it's critical to first grant Congress the benefit of the doubt, I think as you're supposed to under the Supreme Court's cases. Then look at the text of the statute. This text is religiously neutral. And then if you look at the legislative history, it's very important to note that Congress specifically said that its intent was to replace the sex-specific provisions that led to the demise of the prior statute with a religiously neutral benefit. So, again, if you scrutinize the legislative history, Congress said what it was doing, and I think they're entitled to the benefit of the doubt. Again, when they've done so in religiously neutral terms. I'm sorry. But, you know, this is so pointedly religious, not only in terms of accommodating an individual, but then the money goes to an institution which is solely set up for faith healing, and then it gets a little, as someone described it, unbundled service of custodial care, for lack of a better word to call it. Why wouldn't you need to provide that same benefit for people who would reject medical care for non-religious reasons? Well, the Amos case answers that question. Amos says that when the government is lifting a special government-created benefit on religion, it does not need to packet that accommodation, along with similar exemptions, for non-religious individuals. And the notion is that where religious people are being specially burdened by government programs because of their religion, it's permissible and it's neutral for the government to just lift that ban with respect to religious individuals. So that is, I think, the answer to that question. Also, in the Zellman, Mueller, and Witters cases, the Supreme Court has held that where the government does set up a religiously neutral program, where all the conditions have valid secular terms, the program is not unconstitutional depending on who happens to walk through the door to participate in the program because the government doesn't know who will or who won't at any given time choose to participate. The government's job is to write, and Congress's job is to write the program in religiously neutral terms, which is what we've done here. And finally, on this first notion, this first issue that you had raised about the uniqueness of the benefit, I think it's important to note that in the Droz case, this court upheld an exemption from the Social Security laws that basically benefits, if not exclusively, almost only the Amish. It's the 1402G exemption. And the court said that was phrased in religiously neutral terms, so it was not unconstitutional just because it applied basically mostly, if not only, to the Amish. And the Supreme Court in the Lee case, this is in the briefs, specifically referred to the 1402G exemption as a permissible accommodation of religion. Second, you mentioned a question about whether this is an accommodation of individuals' beliefs or an accommodation of the institution. And the government's position is that Congress was intending to accommodate individual beliefs of those who are acutely ill and need medical care, and in fact so much so that they would merit admission to a hospital or skilled nursing facility. And that was the nature of the accommodation. That might have been their intention, but their result wasn't quite that. In other words, if their intention was to accommodate individuals, then you might do it like Droz or some of these others. As I suggested to the first counsel, maybe you would have a tax exemption or you wouldn't have a contribution requirement or something like that. But here the money goes directly to the religious institution whose only purpose is faith healing, which is a religious purpose and is the only reason for that institution's existence. I don't think we've ever seen an accommodation case that puts us that far into the religious institution, or maybe you can tell me one. Well, I guess our response is that, first of all, that it's perfectly permissible for the government to involve religious institutions in providing secular services as long as that's what they're doing and as long as that's the only thing the government is paying for. And here it's clear from the statute that the government is only paying for secular medical care, not medical care, health care services, excuse me. So the fact that we're using religious institutions to provide those services is permissible. The second point is that... It's kind of odd because basically in an institution that doesn't believe in medical care, they're making a medical judgment as to whether or not the person needs a certain kind of care which doesn't constitute medical care. Well, they're not making the final decision. In fact, as our brief notes, the only thing that the statute authorizes RINCES to do is make a claim for reimbursement. Now, certainly they have to evaluate the people who come into their doors to see if they're sick enough that they would justify admission in a hospital, but the payment decision is made first by the fiscal intermediary, an independent group that evaluates each claim to see if the claim would merit payment and involves only the payment of secular services, and that is reviewed by the provider reimbursement review board up through the secretary and ultimately to the courts. So, again, I think it's critical to realize that only secular services are being paid for. And second, the only mentions of religious institutions in the statute have, in our view, valid secular purposes, and we've gone through this in our brief. Congress mentioned that these institutions, these RINCES, would have to act because of their own religious beliefs in order to prevent the system from being overwhelmed by a likelihood of thousands of secular bed and board type institutions trying to participate as providers. And HHS's concern was if this were to happen, the cost of administering this program and making sure that these thousands of providers are complying with it would completely overwhelm what is really a very, very tiny part of the Medicare and Medicaid programs. As the briefs show, only about $5 million or $6 million a year goes to the payment of these benefits. And as you well know, the Medicare and Medicaid systems themselves are in the billions, the hundreds of billions of dollars each year. So this was a reasonable. Perhaps you can explain what the reference was in your brief, that one alternative in looking at the statute in order to not potentially void it for constitutional concerns would be to interpret it slightly more narrowly, which I assumed you were kind of intimating what the court did in the draft case or some of those where they've kind of broadened it. And you said you could delete the word religious. Would you explain your basis for that and then also how one would do that in the context of this statute? It's essentially a severability argument. If you don't believe what I'm saying today, that this provision really does have a valid secular basis, our point was you shouldn't strike down the entire statute. What you should do is eliminate the one provision that says that the RINC has to be acting on the basis of its own particular religious belief. Now, again, we think that is permissible provision that has a valid secular purpose in order to avoid basically threatening to ruin the entire accommodation. But if you don't believe that, then we think Congress would have preferred to let the program go along without that one requirement. So it's a severability in the alternative kind of argument. So you're saying that the severability would be not as to the patient qualifications but as to the institutional qualifications? One of the provisions in the RINC definition, it's that if you want to look at page four of the addendum, these numbers and letters are very difficult to get through, but it's. Give me the statutory site might be helpful. It's 42 U.S.C. 1395 X. S.S. S.S. Paren 1, Paren F. All right. And it says on the basis of its religious beliefs. This is talking about the institution on the basis of its religious beliefs does not provide through its personnel medical items and services. And the plaintiffs have said that the inclusion of the language on the basis of its religious beliefs makes this unconstitutional. We think it doesn't. But that would be what you would take out and sever from the statute if you disagree with us. All right. What would be the practical result of that? The practical result would be that there would be a risk that the program would be opened up to any kind of a provider, any kind of a secular provider who would like to come in and provide these services. In our moot court, one of the judges misspoke. Instead of saying bed and board facilities, he said bed and breakfast facilities. And I think that's what HHS is afraid of. It's afraid that it's going to be overrun by everybody wanting to come in and provide these services. Right now, there's one. But, of course, the reality is there's only some finite number of people, which may include Christian scientists plus others, that would qualify in terms of their religious beliefs. So you wouldn't be able to just go in and check into a bed and breakfast without foregoing medical care, for example, right? Well, I think you would have a large group of secular entities competing for what could be a smaller group of individuals. But there are, I believe, 16 of these institutions. I thought the government liked competition. Well, we do. I see that I've run over the time that I'm supposed to be using. If there are no further questions, I'd like to allow Mr. Shapiro to proceed. Thank you. May it please the Court, Steve Shapiro on behalf of the First Church of Christ Scientists. The continuing refrain in Mr. Bruno's briefs and arguments is that this law is a special deal for Christian scientists and is therefore subject to strict scrutiny. But Congress passed the 1997 amendments for the very purpose of overcoming a sectarian reference in the statute. And it made this amendment part of a general welfare program that accommodates everybody. Catholics, Jews, Protestants, Muslims, nonbelievers all get their choice of health care providers. And many of these religious hospitals, of course, have chaplains, they have chapels, and they have religious nurses. And this is all an established part of the Medicare program. Now, Congress also made a point in the statute of making clear that this is not just a medical program. Congress recognized that people have different health care preferences, and it therefore included nonmedical care from providers such as chiropractors and osteopaths, because Americans don't always use medical doctors for their health care needs. And Congress also made clear in this program that a Medicare beneficiary can reject medical care completely. They can go to the hospital, check in, get health care services, but if their religion dictates that they not have an operation or a transfusion, they're free to make that election. And that takes care of people such as the Hmong people from Vietnam that are referred to in counsel's brief. They can check into the hospital. That's not inconsistent with their religion, but they reject particular medical procedures. So this is a flexible and an inclusive program that is far different from the Larson situation. Let me understand that. If a Hmong person checks into a hospital but declines all medical care, are you saying that the hospital can get Medicaid or Medicare reimbursement for the nonmedical services? They accept particular care. They will accept a doctor's administration but not an operation. They won't accept a transfusion. That's like a Jehovah's Witness situation, too. Yes, and Jehovah's Witnesses are accommodated by this, too.  Well, I'm still back to the practical situation. So you're saying that although this talks about an institution providing services on the basis of religious beliefs that I just spoke with the government counsel about, you're saying that reimbursement is available under this program through medical institutions or no? Well, if a person checks into a medical hospital, such as an Hmong patient, and they want to use their own rituals within the hospital and turn down certain medical procedures, they are accepted in the hospital, and Medicare pays for the hospital's expense in that situation, and that is guaranteed in the statute. So it's a statute that is quite flexible, that attempts to accommodate everybody. It's a universal program, and it's politics in the best sense of Congress trying to include, practically, people of many different faiths and different beliefs. And it's quite different from Larson, where the legislature picked out a particular denomination, the Moonies, and said we're going to keep burdens on that minority religion and exempt all the other religions. This is a classic example of a permissible accommodation under Amos and under Texas Monthly because the accommodation doesn't place burdens on any other people, and because it lifts the burden on elderly and impoverished people who would otherwise be pressured to give up their health care benefits in order to comply with their religion. Now, Mr. Bruno says there's something invidious here because Christian scientists get benefits that other people don't get. In fact, they get a very limited subset of benefits. They don't get any compensation for their practitioners who provide the spiritual health care, and they don't get any compensation for expensive things like MRIs and X-rays and lab tests and prescription drugs. Under the statute, they get payment only for room, board, nursing supplies, and nursing services. And the conference report made clear that no payments may be made for spiritual treatment, and the federal agency has clearly stated that in its regulations, that there will be no payment for any religious aspect of the care provided. The conference report found that these covered nursing services and supplies are plainly secular in nature. I want to just step back. I'm a little troubled by the Hmong people still, and I don't want to beat on it too much, but weren't they eligible, apart from this law, to check into a hospital and receive whatever medical care? They could pick and choose among medical care because they were in a medical institution. They didn't need this law, correct? Oh, that's correct. I'm talking about... That's fine. That's absolutely right. That was true. What I was driving at a moment ago is that three courts now have agreed with Congress's findings about the need for this accommodation. And the findings that Congress made, that these are purely secular services that are being paid for, the changing of the bedpan, the feeding of the patient, the assistance to the patient in walking, the provision of nutritious meals, that those are secular needs. That's a finding that's entitled a deference in this court under the Supreme Court's decision in the Walters case. And the fact that this accommodation doesn't stand alone, but rather is part of a general welfare program, makes a huge difference to this court's analysis because the Supreme Court has told us again and again that government aid is permissible if it is part of a program that benefits the public generally and if the aid is dependent on truly private choices. In that situation, there's no special deal for religion, and the purpose and the effect of the law are the secular purpose and effect of the welfare statute. And this case is a paradigm example because Medicare expends hundreds of billions of dollars every year, and payments to Christian scientists are just a small drop in this large bucket. Under this program, every American is free to make his or her own decision about health care, and it's no business of any other beneficiary if some third beneficiary or some other beneficiary prefers a different system of health care, because this is, after all, a private and a personal decision. Let me ask you if the individual gets to make the choice, but realistically the only choice that can be made is between, if you want to get money, is between a hospital and one of these, you know, one of the alphabet institutions, which at least currently I believe your clients perhaps are the only ones that actually have such an institution. What would be the harm or the hazard to simply say that the individual can make the choice, but you don't have to go to the alphabet institution to receive it, and, you know, there may be some others pop up and there may not? Well, Congress had a very good reason for wanting to channel this into these RINCs, because it had an elaborate system of regulations, and HCFA has adopted additional regulations, and it wanted this to be regulated in a way that is focused precisely on the kind of non-medical health care that's being provided here. And there are decisions from the Supreme Court and from this Court that recognize that accommodating an institution is also proper. So here Congress was accommodating individuals within an institution, and the institution was subject to regulation that Congress thought was very important. What cases would you point us to with respect to institutional accommodation? The Amos case from the Supreme Court and Crisman from this Court. Now, Mr. Bruno has made a great deal in his briefs about the Smith case, but I submit that he's gotten the meaning of that case exactly backwards. Smith holds that courts should not make up their own exceptions to general legislation, but it recognizes that when Congress makes a policy decision to accommodate, that's entitled to deference, and Congress has to be able to draw lines in making these accommodations work in a practical fashion. The Court has told us, too, that laws that give aid to religious groups to serve health care goals are presumptively constitutional. That was the holding in Bowen v. Kendrick, and that's especially true where Congress has carefully considered the constitutional issues. Now, every elderly person, whether a Christian scientist or not, needs physical nursing care after an automobile accident or a stroke or some other disease that leaves that person stuck in bed. Mr. Bruno doesn't like the nursing care here because it's spiritually motivated, but the Supreme Court has told us that doesn't make one particle of difference. In Bowen v. Kendrick, the Court held that spiritual motivation doesn't matter. Congress can send a whole clerical order if it wants to accomplish a secular goal, and Roman Catholic health care is a vivid example of this because the Catholic bishops have told us with respect to Roman Catholic institutions, and I'm quoting, pastoral care is an integral part of Catholic health care, including the full range of spiritual services, such as the sacraments of the church. In a large Catholic hospital today, communion is given 100 times a day, and this is true of other religious hospitals. And HCFA and the American Hospital Association have agreed that chaplaincy programs are a necessary part of a hospital's provision of total patient care. So there can't be the slightest doubt that religious atmosphere and religious motivation are part and parcel of some of the finest hospitals and nursing homes in the Medicare system today. Now, the arguments we've heard are not merely arguments of abstract concern because we're talking about real human beings here. Mr. Bruno is asking this Court to cut off nursing care to elderly and impoverished people who are bedridden and unable to care for themselves and who can't use medical facilities without contradicting their religion. Now, if the Constitution really required that cruel result, and it is a cruel result, that would be one thing, but it doesn't. Mr. Bruno hasn't cited a single factually relevant case in these long briefs that he's submitted, and the Supreme Court has held twice that it is proper for the government to fund health care even in a religious environment. It held that 100 years ago in the Bradfield case, and it held the same thing in Bowen v. Kendrick just 10 years ago. Now, we have the Eighth Circuit decision, the district court decision from Judge Breyer here, the decision from Judge Montgomery, all sustaining this legislation after reviewing these same precedents cited by the same attorney on a virtually identical record. The government defends this program. The Supreme Court has denied certiorari. There's too much comfort from stacking them up because one way or the other, Judge Breyer's decision is going to go away, and the Eighth Circuit, you have a two-to-one decision. Well, I take considerable comfort in the denial of certiorari. Not a single justice voted to dissent in that case against these same arguments, and the argument was made this is inconsistent with Larson, it's inconsistent with the Calder case. Not a single justice, not Justice Stevens, who goes the furthest in Mr. Bruno's direction, thought that this was worthy of a grant of review. And now that Congress has considered the constitutional issues carefully and reviewed the constitutional precedents, we submit that this truly is a situation where deference rather than suspicion is warranted. Thank you. Did you get a tally on the cert vote? How many votes for cert? In the prior case, there were no votes for cert. Every single justice voted against cert. How do you know that? Where is it? I mean, there was no recorded dissenting opinion at the time. No recorded dissent, but they don't publish whether they... That's true. But in an issue of this sort, you would think that if a justice disagreed, there would be some expression. As we know, the records of dissent are not numerous. That's true. I think we've given you a fair amount of extra time, and with that I thank you for the argument. And you may have two minutes additional for your reply. We thank the Court. I think I already had one minute left over from my original time, and if I could have an additional two, I would appreciate it. On the sect discrimination, the most sect-selecting provision of this statute is in paragraph F, and it's not only that on the basis of religious beliefs it doesn't provide medical care, but it's on the basis of its religious creed it doesn't believe in a medical diagnosis or a medical examination. There's only one religion that I know of that has that as part of its creed, and that's Christian science. Now, you asked about the monk who checks into a hospital and refuses a certain form of medical care. Judge McKeown, I think you asked the question exactly correct. What if they objected to all medical care? Would they still get hospital benefits for nursing and so forth? And the answer is clearly no, they wouldn't, because of the reasonable and necessary and the therapeutic value of treatment that has to be rendered in connection with the ancillary services. The person must be receiving therapeutic medical care that's scientifically proven to be of value and aid in the healing of that person. So the person who checks into the hospital, the monk, for example, would not receive Medicare for that hospitalization. You've also got the fundamentalist sects who believe in anointing with holy oil. They would object to all medical care, but they don't object to a medical diagnosis, because Christian science is unique. They think that the doctors can't. That might be another group that could go to the sanatoria if they needed it. No, they couldn't, because the sanatoria, well, possibly they could, but the sanatoria is prohibited from diagnosing what they have, which prevents, I guess, an even-handed utilization under the program. We don't know what these people are suffering from, and when Mr. Shapiro says that they're receiving only secular services, there's nothing in the statute that says that these are only secular services. In fact, Congress rejected language in its draft bill that said that the services in the rincey must be comparable to or the same as what they would be in the medical hospital. Congress rejected that as a requirement. There's no requirement that the services be the same. The only thing they're relying on here is a description of nursing services. The statute allows for payment of nursing services. Well, there's no comparability between what Christian science nurses do and what medical nurses do. Medical nurses are trained. They're based on physician orders only. Christian science nurses are based on spiritual intuition and spiritual impulses in their care. The Droz decision, again, dealt with a statute that dealt with individuals and not religious organizations, so I think it's not a precedent here for this case. Thank you. I think you've stated your time for the question. I didn't want to take up your time because you haven't been challenged on this by the government or in the district court. But to be candid with you, I really have questions, at least, about your standing. Now, I know that Flass v. Cohen gave standing where there was an educational issue. But as you have acknowledged, the Supreme Court has dealt with these cases on a category-by-category basis. And after Flass, there came Valley Forge Christian College, where Justice Rehnquist went about as far as he could go in 1982 to cast doubt on Flass. Now, with a different Supreme Court, with the Rehnquist Court 20 years later, I have to wonder if it would be willing to acknowledge you had any standing. Now, that may not be a decision for this court, but it's certainly something we have to think about. I would like to know how you think, if we took Valley Forge seriously, you have any standing. Judge Noonan, this issue was briefed in the district court, and that's part of this record. The court answered the question of standing in a program which discriminated amongst religions in Curious Joel. In fact, I think it was Justice O'Connor said that we don't have to wait for another religious organization who wants to claim the benefits of the statute to come along. Isn't it possible that this is a categorical approach? When education is involved, the court's very sensitive. But when you're just giving property away from the government, it's different. Well, there's a separate provision of the Constitution that allows the government to own and manage its property, and that's what the Valley Forge case was based on. It wasn't based on taxpayer standing, although that could have been an alternative basis for standing. That's right. That's right. I disagree with Valley Forge, but I think the court really answered it in Curious Joel when it said that we don't have to wait for another religious organization who wants to claim the benefits of the statute. The only standing in Curious Joel was that of a taxpayer. Well, we may not get to it, but I raise an interest in your answer. Maybe in the long run it will be answered. Thank you. Thank you. Thank all counsel for your arguments. They're very helpful, and the briefing is very good, both from the counsel and the amicus. The case of Congress' Scully and the First Church of Christ's Scientist.
judges: Noonan, McKeown, Rawlinson